Filed 5/2/23  In re L.O. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re L.O., a Person Coming Under Juvenile Court Law. | B321341 |
| | (Los Angeles County Super. Ct. No. 17CCJP00592A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| DANIELLE O., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Mary E. Kelly, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Kelly G. Emling, Deputy County Counsel, for Plaintiff and Respondent.

# INTRODUCTION

Appellant is the mother of L.O., a dependent of the juvenile court. Mother appeals the juvenile court's grant of a petition to terminate her visitation with L.O., brought by respondent Los Angeles County Department of Children and Family Services (DCFS). Mother also appeals the juvenile court's denial of her own petition to reinstate reunification services with L.O.

We affirm. The record demonstrated, with substantial evidence, a long history of severe problems with Mother's visitations with L.O. Those problems burdened the prospect of L.O. finding a permanent home. Based on that record, the juvenile court could reasonably conclude that resuming L.O.'s visitation with Mother, or reinstating reunification services, was not in L.O.'s best interests, and was not otherwise appropriate.

# FACTUAL AND PROCEDURAL BACKGROUND

A. *Mother Asks DCFS to Take Custody of L.O.*

In September 2017, Mother called the Child Protection Hotline. She said that she was unemployed, was living in a van, and lacked the patience to take care of her daughter L.O. (born Aug. 2013). Mother explained to a children's social worker (CSW) that her unstable mental state and severe PTSD placed L.O. at risk, and that she lacked the patience and capacity to care for her. L.O. told an interviewer that she did not want to stay with Mother, who was not nice to her and who hit her with a spoon.

Two days later, DCFS filed a petition containing two counts under Welfare and Institutions Code section 300, subdivision (b)(1).[1] Count b-1

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

alleged Mother had a history of substance abuse and was a current abuser of marijuana while caring for L.O. Count b-2 alleged Mother was unwilling and unable to care for L.O. The court detained L.O. from Mother and granted monitored visitation.

B.    *The Court Removes L.O. From Mother*

L.O. stated that she did not want to return to Mother (whom she called "Danielle") or live in her car. Mother claimed she was willing to care for L.O. but was mentally unstable and unable to do so. Mother stated she missed L.O. but wanted her to have a better, stable life. She declined reunification services.

Following a hearing, the juvenile court removed L.O. from Mother and ordered Mother to submit to random drug tests and individual counseling.

C.    *Mother Fails to Reunify*

After the court removed L.O., Mother failed to follow her case plan. Although Mother agreed to reunification services, she explained she did so only because she did not want L.O.'s maternal grandmother to gain custody of L.O., and "would do anything to prevent that from happening."

The juvenile court set a twelve-month review hearing for December 2018. In the time between the court's removal of L.O. and that hearing, L.O. was placed with three separate foster families. Mother's visits and communications with L.O. were inconsistent. Mother expressed hostility toward L.O.'s first foster family. She told the second one that, if they would permit an open adoption, she would relinquish her parental rights, but if they refused, "she would drag out the case as long as possible." L.O.'s first foster family asked that she be removed in part "due to consistent negative

3

interactions with the mother." The second foster family asked that L.O. be removed due to "continued aggression" by L.O. toward the other children in that placement. L.O. often misbehaved after visiting or speaking with Mother, or hearing that Mother wanted to visit or speak with her. L.O. continued to say that she did not want to live with Mother, and that Mother did not make her feel safe.

At the twelve-month review hearing in December 2018, the court terminated Mother's family reunification services. It found Mother was not in compliance with her case plan, had not visited regularly, and had not made progress or demonstrated an ability to make progress. The court set a hearing under section 366.26 and a review of permanency planning hearing. The court did not order that Mother's visitation stop.

### D. *DCFS Asks to Limit Mother's Visits*

On May 9, 2019, L.O. was moved to a fourth foster family after her third foster family moved.

In June 2019, DCFS filed an ex parte request to require Mother's visits occur only in a "therapeutic setting," based on a May 14, 2019 visit where Mother "was observed to be 'very loud' and 'yelling,'" and L.O. was "'visibly distraught'" and "crying 'uncontrollably.'" Mother had been "verbally aggressive and then 'lunged' at the staff," causing the visit to be canceled. Mother then "'grabbed [L.O.] by the arm, sat down in the chair, then held [L.O.] between her legs' and 'put her arms around [L.O.].'" When asked to let L.O. go, Mother "only held her tighter" while L.O. cried and tried to escape. Mother stated this was the "last time" she would see L.O., and so she intended to spend an hour with her. L.O. stated she did not want to be with

4

Mother, and that Mother was "'scary.'"[2]  However, DCFS acknowledged that Mother behaved appropriately during a subsequent visit.  The court ordered DCFS to arrange for visits in a therapeutic setting, but that in the interim, DCFS was to permit monitored visits.  In August 2019, after difficulties in arranging therapeutic visits, the court lifted the restriction that visits occur in a therapeutic setting.

E.    *Section 388 Petitions*

1.    *Mother and DCFS File Section 388 Petitions*

In July 2019, Mother filed a section 388 petition asking the court to, among other things, reinstate Mother's family reunification services.  Mother asserted that she had gained insight from being enrolled in counseling and completing three parenting courses, that she now lived in Los Angeles and had a support system to help her care for herself and L.O., and that she had a job.

In August 2019, L.O.'s caregiver stated L.O. had been "'acting out very badly'" since Mother began increasing the frequency of her visits.  L.O. had started lying, behaving aggressively toward the other children in the home, biting, hitting, throwing toys, pulling hair, trying to injure the family pets,

---

[2]    On June 11, 2019, L.O.'s third foster parent (with whom she was no longer living) wrote an e-mail to Mother's attorney, stating that while she fostered L.O. from November 2018 to May 16, 2019, L.O. stated that she loved Mother and wanted to go home with her.  However, L.O. moved from this foster parent's home on May 9, 2019, five days before the incident that was the subject of DCFS's ex parte.  DCFS also noted this foster parent had never monitored visits between L.O. and Mother, and that the foster parent's statements contradicted previous statements the foster parent had made to DCFS about L.O. never wanting to live with Mother again and L.O.'s indifference to Mother's visits.

and "acting out sexually." L.O. took no responsibility for her actions, instead blaming the other children in the household. L.O. was moved to her fifth placement on August 22, 2019. The fourth foster family could not "accommodate [L.O.]'s 9 hours of visitation per week with [Mother]. They also found it difficult to establish a positive relationship with [Mother] and stated that [L.O.]'s behaviors became worse once visitation became consistent." The family worried about Mother's "'unpredictable and sometimes aggressive behavior.'"

Two days after L.O.'s fifth placement, Mother visited L.O. L.O. was not happy to see Mother and would not let go of her new foster parents. L.O. attached herself to the DCFS monitor and refused to interact with Mother, infuriating her. Mother told L.O. she understood she was upset because her fourth foster family "'threw [her] away,'" but that it was not Mother's fault. When the CSW informed Mother these were inappropriate remarks, Mother began yelling at the CSW. As the visit continued, L.O. stated she wanted to go home with "'mommy and daddy,'" referring to the foster parents.

In September 2019, DCFS filed a section 388 petition to terminate Mother's visitation, citing the August 24 visit. DCFS also cited a telephone call between Mother and L.O. on September 12, where Mother berated L.O. for not wanting to talk to her.

### 2. *The Petitions Are Not Heard for Two Years*

From 2019 to 2021, the court continued the hearings for both petitions several times. In the interim, Mother continued visiting L.O. L.O. was moved five more times.

#### (a) *Mother's Visits During the Pendency of the Petitions*

Although Mother consistently visited L.O., the pair's interaction varied. At times, L.O. was happy to see Mother and interacted with her in a positive

6

manner. At other times, L.O. adamantly did not want to see or interact with Mother, and would ignore Mother's attempts at communication. Mother behaved inappropriately during several visits. She physically restrained L.O. on several occasions. She often seemed more concerned with her own feelings than L.O.'s needs and wants. Any progress made in improving L.O.'s behavior often regressed after visiting with Mother.

In January 2021, because of the issues with Mother's visits, the juvenile court granted DCFS's request to limit visits to a therapeutic setting. The therapist noted that Mother was resistant toward the therapist's suggestions. The therapist and Mother established a "code word" to be used when the therapist wanted to redirect Mother without undermining her authority in front of L.O. However, when the therapist used the code word, Mother ignored her. On another occasion, Mother was observed physically restraining L.O. who was "struggling to free herself from Mother's hold." Mother refused the therapist's first two requests to release L.O. Mother also yelled at the therapist. The therapy center subsequently determined it was counterproductive to continue conjoint therapy for L.O. and Mother, and stated they would not resume therapy until Mother had been deemed sufficiently safe to be granted unmonitored visits with L.O. L.O.'s foster mother reported L.O.'s behavior was again regressing.

Following an admonition from the court to cooperate with her therapists, Mother and L.O. found some success at a different therapy center. However, during a visit with Mother in late November 2021, L.O. refused to exit the car when she arrived at the therapy center, and Mother attempted to get in the car with L.O. L.O. screamed at her to leave and tried to close the car door. Mother repeatedly ignored L.O.'s requests to leave. L.O. was "distraught" after this aborted visit and "required excessive behavioral

redirections in the hours following the incident." L.O.'s caregivers "reported that these behaviors are not consistent in the home but rather specific to the visitation with mother (either shortly before or after)." In another visit in January 2022, L.O. ran from the therapy center into the street. Mother chased her and physically picked her up and returned her to the building while L.O. struggled to be released. However, visits seemed to improve thereafter, with a later therapist reporting that Mother was behaving appropriately, and L.O. was engaging positively with her.

(b)     *L.O.'s Placements During the Pendency of the Petitions*

In November 2019, L.O. was placed with her sixth foster family. The fifth foster family reported that during the time they cared for L.O., her "emotional stability deteriorated to the point that she became unable to obey any request we made of her; yelled, screamed or cried 5 or 6 times a day when told she couldn't have something she asked for; engaged in behaviors such as climbing up on very fragile furniture and crossing the street by herself, despite being asked not to."

L.O. stayed with her sixth foster family until May 2020. The foster mother reported that the mandated calls from Mother disrupted the household. Often, L.O. refused to speak with Mother and would run away; Mother would yell into the phone to tell L.O. to come back. Then the family would need to spend time calming L.O. down and getting her "back on track." The foster mother also stated that within a month of L.O. coming to live with her, Mother began behaving hostilely toward the foster mother, once telling L.O. that she was going to "'[F] [the foster mother] up.'" Mother texted the foster mother at three in the morning, called her bitter and pathetic, and blamed her for L.O.'s refusal to speak with her. L.O. was moved to a seventh family.

8

In May 2021, L.O.'s seventh foster family stated they were no longer interested in adopting L.O. because she was not a "good fit" for their family. L.O.'s behavior in their home had "not progressed" and she was "not amenable to redirection or interested in bonding with the family." In August 2021, L.O. was moved to her eighth foster family. Though L.O. showed no emotion when being told she would be moved or when she was moved, two subsequent therapy visits could not be completed because L.O. was yelling, screaming, and crying, and repeatedly stated she did not want to see Mother.

In November 2021, L.O.'s eighth foster family asked that she be removed, citing "serious concerns regarding [L.O.]'s behavior in relation to the visitation with" Mother. L.O. often stated she did not want to go for the visits and would act out before and after them. L.O. was placed with her ninth foster family in November 2021, and then quickly moved to her tenth such placement when the ninth was determined not to be a "good fit."

### 3. *The Court Denies Mother's Petition and Grants DCFS's Petition*

The court heard both Mother's and DCFS's section 388 petitions in June 2022. Mother testified regarding her parenting classes and conjoint therapy with L.O. and introduced into evidence a letter from her current therapist stating that the therapeutic visits between Mother and L.O. were going well. She also accused DCFS of fabricating or distorting events. In closing argument, her counsel argued that "these multiple positive updates" constituted a change in circumstances, and that it was in L.O.'s best interest to reinstate Mother's reunification services because the court had yet to adopt a permanent plan. L.O.'s counsel asked the court to deny Mother's request for more services and to terminate her visits. L.O.'s counsel argued both that Mother had not demonstrated any changed circumstances, and that it was not in L.O.'s best interest to continue reunification services or continue visits.

9

Counsel cited to L.O.'s behavior surrounding those visits, and the negative impact they had on finding L.O. a permanent home. DCFS's counsel echoed L.O.'s counsel. DCFS's counsel argued that the recent positive reports from one therapist did not constitute sufficiently changed circumstances given the previous negative experiences. He argued that it was not in L.O.'s best interest to permit visits with Mother to continue.

The juvenile court denied Mother's section 388 petition and granted DCFS's. It found that Mother's circumstances were "changing" but not "changed," and that further reunification services were not in L.O.'s best interests. It also found Mother's visits detrimental to L.O. Mother timely appealed.

## DISCUSSION

"Section 388 allows a parent to petition to change, modify, or set aside any previous juvenile court order. (§ 388, subd. (a).) 'The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child.'" (*In re J.M.* (2020) 50 Cal.App.5th 833, 845.) "We normally review the grant or denial of a section 388 petition for an abuse of discretion." (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.) "A court exceeds the limits of legal discretion if its determination is arbitrary, capricious or patently absurd. The appropriate test is whether the court exceeded the bounds of reason." (*In re L.W.* (2019) 32 Cal.App.5th 840, 851, citing *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

A juvenile court's factual findings are reviewed for substantial evidence. (*In re J.M.*, *supra*, 50 Cal.App.5th at p. 846.) In such a review, "[w]e do not reweigh the evidence or exercise independent judgment, but

10

merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.) "[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

### A.  *The Court Did Not Err in Granting DCFS's Petition*

Mother contends the court erred in finding that eliminating her visits would be in L.O.'s best interest.  We disagree.

"[B]est interests is a complex idea." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530.)  In determining the best interests of a child, "a court must perform a more nuanced best interests *analysis*, considering, at a minimum: '(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers,' taking into account 'any interest of the child in preserving an existing family unit, no matter how, in modern parlance, "dysfunctional"' and 'the complexity of human existence'; and (3) the nature of the changed circumstances and the reason a change was not made sooner." (*In re J.M.*, *supra*, 50 Cal.App.5th at p. 848.)  This list is not exhaustive.

Here, there is ample evidence that Mother's visits were detrimental to L.O.  When L.O. visited Mother, Mother often behaved inappropriately, sometimes physically restraining L.O. and refusing to let her go.  Mother would refuse to give L.O. space and attempt to alternately browbeat or guilt L.O. into visiting with her.  As noted by numerous caregivers and therapists,

11

L.O.'s misbehavior escalated immediately before and after her interactions with Mother. Several foster families cited this misbehavior as a reason they were not interested in providing L.O. with permanence, requiring her to be moved from one foster family to another. There can be no serious dispute that L.O.'s continual displacement took a heavy toll on her. After one such move, Mother told L.O. that her foster family "'threw [her] away'" but, rather than comfort L.O., she hastened to assert that it was not Mother's fault that L.O. had been moved again.

Beyond that, as to bonding, L.O.'s bond with Mother seemed to vary depending on the visit—at times she seemed happy to spend time with Mother, but at other times, she expressed extreme hostility toward Mother, refusing to see or talk to her. And although L.O. continually needed new placements, she typically seemed to bond well with her foster parents, calling them "mommy" and "daddy," while she called Mother "Danielle."

Mother does not deny any of this evidence. Instead, she contends that regardless of how she behaved in the past, by the time DCFS's petition was heard, her relationship with L.O. had improved. She thus argues that no evidence supported a conclusion that Mother's visits were detrimental to L.O. *at the time of the hearing*. But the juvenile court was not required to adopt the cramped temporal view Mother urges. A court may consider past events in determining potential detriment, and the juvenile court here could consider the entire history of the visits between Mother and L.O. (Cf. *In re Petra B.* (1989) 216 Cal.App.3d 1163, 1169 [though jurisdiction requires risk of harm at time of hearing, "[i]n determining whether the child is in present need of the juvenile court's protection, the court may consider past events"].) Moreover, Mother's visits with L.O. had frequently alternated between good and bad. Thus, positive experiences in visits close in time to when the

juvenile court heard DCFS's petition did not guarantee positive visits going forward. At the very least, substantial evidence supports the trial court's conclusion that visits between L.O. and Mother would likely remain problematic. That means we cannot conclude that the juvenile court abused its discretion in finding that visitation with Mother was not in L.O.'s best interests. And, therefore, we cannot conclude that the juvenile court abused its discretion in granting DCFS's petition.

B.    *The Court Did Not Err in Denying Mother's Petition*

To succeed on her own separate section 388 petition, Mother was required to demonstrate both that her circumstances had changed, and that reinstating reunification services was in L.O.'s best interest. (*In re J.M.*, *supra*, 50 Cal.App.5th at p. 845.) The court found she failed on both counts. Because Mother had the burden of proof to demonstrate both elements, we evaluate whether the evidence compelled a different conclusion. We conclude it did not.

1.    *Mother Did Not Demonstrate Changed Circumstances*

"A parent establishes a substantial change of circumstances for purposes of section 388 by showing that, during the period between termination of reunification services and the permanency planning hearing, he or she has resolved the previously unresolved issues supporting juvenile court jurisdiction." (*In re J.M.*, *supra*, 50 Cal.App.5th at p. 846.)

Here, the juvenile court originally found jurisdiction based in part on Mother's inability "to provide ongoing parental care and supervision." And, by finding no changed circumstances when it heard the section 388 petition in June 2022, the juvenile court impliedly found that Mother was still unable to provide ongoing parental care and supervision. We uphold that finding.

13

While, once again, the record does reveal some positive steps taken by Mother in advance of the June 2022 hearing, including additional insight gained from counseling and parenting classes, that evidence does not *compel* the conclusion that the juvenile court *had* to find that Mother was now capable of providing ongoing parental care and supervision for L.O. Multiple caregivers over multiple years reported that Mother's erratic behavior toward them, as well as L.O.'s misbehavior surrounding Mother's visits and phone calls, were among the reasons they asked to have L.O. removed from their home. Mother presented a long history of inability to care for L.O., described above. The juvenile court was not required to conclude, faced with all that evidence of past behavior, that Mother's progress in parenting classes and therapy constituted a legally relevant change of circumstances.

### 2. *Mother Did Not Demonstrate That Reinstating Reunification Services Would Be in L.O.'s Best Interest*

Equally, for largely the same reasons discussed above in connection with DCFS's petition, the record amply supports a finding that further visits with Mother were not in L.O.'s best interest. Mother's visits with L.O. had long generated tremendous turmoil. It is unclear (and certainly the evidence does not compel a finding) that Mother's taking additional parenting classes or participating in more counseling would improve her visits with L.O. Beyond that, by the time of the hearing on Mother's section 388 petition, L.O. was living in her tenth foster home. Reinstatement of reunification services for Mother would serve only to delay permanency for L.O.

Mother argues, once again, that the court's decision is unreasonable in light of her improved relationship with L.O. and the lack of a foster family willing to adopt L.O. Again, Mother's apparently improved relationship at the time of the hearing was insufficient to overcome the tumultuous history

of her previous visits.  We hold that the evidence does not compel a finding that reinstating Mother's reunification services would benefit L.O., and thus that the juvenile court did not abuse its discretion in determining that reinstatement of services was not in L.O.'s best interests.  For that reason, too, the court did not err in denying Mother's petition.

## DISPOSITION

The juvenile court's orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


DAUM, J.[*]

WE CONCUR:


CURREY, Acting P. J.


COLLINS, J.

---

[*]Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.